1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT

8

FOR THE EASTERN DISTRICT OF CALIFORNIA

9
10

11   ROBERT E. LEVY,                         No.  2:13-cv-02643-KJM-CKD

12              Plaintiff,

13        v.                                 ORDER

14   COUNTY OF ALPINE, et al.,

15              Defendants.

16

17

18        Alpine County is home to about 1,100 people, fewer than any other county in

19   California.  *See* U.S. Bureau of the Census, Dep't of Commerce, 2010 Census.[1]  Markleeville, the

20   County Seat, is home to about 200.  *Id.*

21        Robert Levy, former Undersheriff of Alpine County, brings this case against

22   Alpine County and two of its officers.  He charges them with violations of his civil rights, age

23   discrimination, retaliation, and defamation.  The defendants move for summary judgment.  The

24   court held a hearing on January 29, 2016.  Douglas Watts appeared for Levy, and Gayle Tonon

25   appeared for the defendants.  For the following reasons, the motion is granted in part.

26

27        ───────────────

28        [1] The court takes judicial notice of these dicta.  *See, e.g.*, *United States v. Esquivel*,
     88 F.3d 722, 727 (9th Cir. 1996).

1    I.      EVIDENTIARY OBJECTIONS

2            The court first briefly addresses the defendants' evidentiary objections.  *See* Resp.

3    & Objections Stmt. Disputed Facts, ECF No. 35-1; Resp. & Objections to Stmt. Undisputed

4    Facts, ECF No. 35-2; Objections to Declarations, ECF No. 35-3; Notice of Objections, ECF

5    No. 36.

6            In recent years, many judges in this district, including the undersigned, have

7    cautioned litigants against advancing numerous, terse and reflexive objections at summary

8    judgment, especially when the objector is the moving party.  *See, e.g.*, *Lindell v. Synthes USA*,

9    ___ F. Supp. 3d ___, 2016 WL 70305, at *2 (E.D. Cal. Jan. 6, 2016); *U.S. E.E.O.C. v. Placer*

10   *ARC*, 114 F. Supp. 3d 1048, 1052–53 (E.D. Cal. 2015); *Hanger Prosthetics & Orthotics, Inc. v.*

11   *Capstone Orthopedic, Inc.*, 556 F. Supp. 2d 1122, 1126 n.1 (E.D. Cal. 2008); *Burch v. Regents of*

12   *Univ. of Cal.*, 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006).  Defendants are directed to these

13   orders, for future reference.

14           Standards of admissibility at trial and summary judgment are governed by

15   different rules and different motivations.  Whereas the full panoply of the Federal Rules governs

16   evidence presented to a jury at trial, Federal Rule of Civil Procedure 56 provides that a party may

17   raise objections if "the material cited to support or dispute a fact cannot be presented in a form

18   that would be admissible in evidence."  Fed. R. Civ. P. 56(c)(2).  As this language suggests, at

19   summary judgment the evidence's propriety depends not on its form, but on its content.  *Celotex*

20   *Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Block v. City of L.A.*, 253 F.3d 410, 418–19 (9th Cir.

21   2001).  Thus, for example, on review of summary judgment, the Ninth Circuit has considered the

22   hearsay contents of a diary whose substance would have been admissible in some other form at

23   trial.  *See Fraser v. Goodale*, 342 F.3d 1032, 1037 (9th Cir. 2003).  Similarly, if evidence lacks

24   full-fledged authenticity or foundation at summary judgment, it may yet warrant consideration if

25   "substantive evidence could be made use of at trial."  *Portnoy v. City of Davis*, 663 F. Supp. 2d

26   949, 953 (E.D. Cal. 2009) (citing *Fraser*, 342 F.3d at 1036) (quotation marks omitted).

27           Relevance, vagueness, speculation, and similar objections are particularly ill-fitted

28   for summary judgment because the court may simply disregard irrelevant or indecipherable

2

1  evidence.  *See, e.g.*, *Burch*, 433 F. Supp. 2d at 1119.  Likewise, an objection that a statement is

2  argumentative or mischaracterizes the record either requests a credibility determination unsuited

3  for summary judgment or would better be directed at the underlying evidence itself.  *See, e.g.*,

4  *Stonefire Grill, Inc. v. FGF Brands, Inc.*, 987 F.Supp.2d 1023, 1034 (C.D. Cal. 2013).

5          The court overrules each of the defendants' objections.  First, the hearsay

6  objections attack evidence that is likely admissible in some other form at trial.  In addition, much

7  of the supposed hearsay is not hearsay at all, but the statements of a party opponent or statements

8  cited for some purpose other than establishing their truth.[2]  *See, e.g.*, Responses & Objections nos.

9  4, 9, ECF No. 35-1; *cf.* Fed. R. Evid. 801(d)(2).  Second, the court disregards irrelevant evidence

10  and counsel's raw assertions unsupported by evidence, and therefore overrules objections based

11  on relevance, misstatement of the record, improper argument, and overrules objections that a

12  witnesses' statement is unsupported in turn by citations to other evidence.  Finally, the court

13  overrules objections based on assertions of immunity.  The motion papers, not separate statements

14  of fact, are the correct means of arguing affirmative defenses.

15  II.      <u>UNDISPUTED FACTS</u>

16          Levy was born in 1964.  Pl.'s Response Undisputed Material Facts (UMF), ECF

17  No. 32.  He was hired as a Deputy Sheriff in Alpine County in April 1995 and promoted to

18  Undersheriff in 2000.  UMF nos. 4, 5.  In general, as Undersheriff, Levy "ran the operations" in

19  the Sheriff's Office.  Crawford Dep. 19.  Specifically, he supervised officers and patrol, ensured

20  investigations were completed, and he briefed the Sheriff daily, among other duties.  *Id.* at 19–20.

21  For most of Levy's employment, John Crawford was Sheriff.  *See generally* Crawford Decl., ECF

22  No. 34.

23          At about the same time Levy began working as Undersheriff, the County and the

24  State of California began discussions on a joint project to develop and update the

25  telecommunications infrastructure on a mountaintop within the County (the Hawkins Peak

26

27          [2] Hearsay is a particularly strange objection in a case of alleged defamation such as this
one, where a plaintiff presumably intends to prove a defamatory statement is false, not true.  *See*

28  Cal. Civ. Code §§ 44–46.

project).  *See* Levy Dep. 31; Knorr Decl. Ex. F, at 1, ECF No. 026-4.  Discussions about a similar project on another peak began in 2008 (the Leviathan Peak project).  *See* UMF no. 6; Levy Dep. 30–31.  As Undersheriff, Levy took on several duties related to the telecommunications projects, although these duties were not strictly within his job description, and he received no separate compensation for this work.  *See* Levy Dep. 155–56; *id.* Ex. H; Nunes Dep. 28, 50.  Among other things, Levy made reports on the projects to the County Board of Supervisors.  *See generally* Knorr Decl. Ex. F; Veatch Decl. ¶ 8, ECF No. 34.  Tom Sweeney, a former college professor, and Henry "Skip" Veatch, former Alpine County Sheriff, were both on the Board of Supervisors during the relevant period.  *See* Sweeney Dep. 10–12; Veatch Decl. ¶ 4.

Pamela Knorr began working as the County's administrative officer in 2008.  Knorr Decl. 1.  During this time she was also the County's personnel director, Knorr Dep. 40, and at some point she further assumed the responsibilities of social services director, Veatch Dep. 66.  Knorr reported to and worked closely with the Board of Supervisors.  Knorr Decl. 2.  Knorr also began working with the Sheriff's Department on the telecommunications projects.  *See* Crawford Dep. 88.  In about January 2011, she asked to take over control of the Leviathan Peak project, and the Sheriff's Department assumed an advisory role.  *Id.*

Knorr and Levy did not get along.  They butted heads over Knorr's requests for access to information that Levy believed she had no right to receive; he often denied her requests.  *See* Levy Dep. 242–47.  Levy recounts that while he was on vacation in 2010, Knorr told the Sheriff a "radon problem" required some of Levy's staff to relocate to another office about five miles away.  Levy Dep. 183–84.  When Levy returned from vacation, he found his staff had moved, and he was eventually forced to relocate his own office and join his staff.  *Id.* at 184.  Levy believes Knorr invented the "radon problem" because she was mad at him.  *See id.* at 183-85.

Levy also complained to the Sheriff and to Veatch about what he believed was Knorr's unlawful discrimination against "older management workers."  Levy Dep. 164–65.  Levy supports his opposition with testimony from the County's former Human Relations (HR) Specialist, Beth Nunes, who believed Knorr engaged in a "nefarious" campaign to shed

4

1   employees Knorr believed were too old, paid too much, or otherwise undesirable.  Nunes Decl.

2   ¶ 5, ECF No. 34.  Nunes recalls Knorr saying one particular staff member had to go, even if it

3   meant Knorr had to "make her sit there and count paper clips all day."  Nunes Dep. 115–16.

4   Another witness remembers Knorr relating her goal in a Board of Supervisors meeting: "creating

5   a younger, cheaper workforce."  Hartnett Dep. 38–39.

6          For her part, Knorr said she believed Levy had purposefully withheld information

7   about the costs of the Leviathan Peak project.  Nunes Dep. 10, 39–41, 61.

8          Levy also had a rocky relationship with Sweeney, with whom he had

9   disagreements about the funding and installation of infrastructure for the County's emergency

10   services, paramedics, and fire protection before he was promoted to Undersheriff.  Levy

11   Dep. 255–57.

12          In mid-2012, the County Board of Supervisors received a report from the Sierra

13   West Group, a construction consulting company, on the expected costs of the Leviathan Peak

14   project.  *See* Knorr Decl. Ex. F, at 9; Levy Decl. Ex. A, at 2–6.  Some evidence suggests the

15   report was presented in April 2012, *see* Knorr Decl. Ex. F, at 9, whereas other evidence suggests

16   the report was not completed before July 2012, *see* Levy Decl. Ex. A, at 2, but the discrepancy is

17   not material to this order.  In August 2012, on her own initiative, Knorr performed a "financial

18   analysis" to compare various cost estimates for the Leviathan Peak project, including the Sierra

19   West estimates, and she submitted her findings to the Board of Supervisors.  *See* Knorr Decl. 2 &

20   Ex. B.  She described her findings as "beyond disturbing" and expressed concerns that the County

21   was at risk of incurring additional, unexpected multi-million-dollar liabilities.  *Id.* Ex. B, at 1.

22   She recommended the Board engage a "neutral party" to investigate.  *Id.*

23          The Board authorized Knorr to retain a third party investigator.  *See id.* at 2–3 &

24   Ex. C.  A San Francisco law firm, Liebert Cassidy Whitmore (LCW), was retained.  *Id.* at 3.

25   After conducting interviews and reviewing public records, LCW pronounced that no County

26   official had violated the law or engaged in any self-dealing.  *Id.* Ex. F, at 1.  But on the other

27   hand, LCW found "the Board of Supervisors was not provided complete and factual information

28

1   necessary to make the budgetary decision to undertake the multi-million dollar Leviathan Peak

2   project." *Id.* Ex. F, at 1.  Among other recommendations, LCW wrote,

> Staff should not be permitted to negotiate contracts without the guidance of County Counsel, particularly contracts with significant legal implications.  In this case, it appears that County Counsel was not consulted until the Undersheriff had negotiated the lease agreement with an attorney from the state.  This resulted in a one-sided contract with onerous provisions for the County.  County Counsel, who has knowledge and experience regarding public works contracts, can negotiate a fair contract that minimizes the risk of costly claims and litigation.

*Id.* at 10–11.  The LCW report was presented at the Tuesday, November 20, 2012 Board of Supervisors meeting.  *See* Knorr Decl. 3 & Exs. D, E.

Levy and Veatch disagree with LCW that the Board received less than "complete and factual information."  *See* Levy Dep. at 117; Veatch Decl. ¶ 11.  They believe Knorr intended the investigation as retaliation against Levy for his reports of Knorr's perceived misdeeds.  *See* Levy Decl. ¶¶ 5–6; Veatch Decl. ¶ 10.  Levy, Veatch, and Crawford also believe the report was a backdoor personnel investigation in violation of the California Peace Officers Bill of Rights.  *See* Levy Decl. ¶ 6; Veatch Decl. ¶ 10; Crawford Decl. ¶ 7.  Levy alleges Knorr and Sweeney used the report to wound his personal and professional reputation; he points to evidence that on Friday, November 16, 2012, a few days before the LCW report was presented to the Board of Supervisors, it was released by email and distributed among the County's residents.  *See* Levy Dep. 171–72; Levy Decl. ¶ 5; *id.* Ex. B (email chain from Teola Tremayne, Nancy Thornburg, and Tom Sweeney urging recipients to read the report and attend the Board of Supervisors Meeting on November 20, 2012).

In addition to the LCW report, Levy cites the following disparaging statements:

- During a break in a Board of Supervisors meeting, Sweeney said loudly to Crawford, "I don't trust you guys."  Levy Dep. 110.  About ten people were present.  *Id.*

- Knorr and Sweeney told Nunes Levy had "purposefully withheld key project cost estimates in regard to the communications projects."  Nunes Dep. 61.

/////

/////

6

- During a coffee break, Sweeney told Nunes that Levy was dishonest, *id.* at 53, and told her and others that Levy "frustrates me," "I don't think he's telling the whole truth," and "I think he knows how much it's going to cost, and he just drags this out," *id.* at 58–59.

- According to an article published February 19, 2011, in a "monthly meeting," "Supervisor Tom Sweeney . . . answer[ed] questions and inform[ed] the public about the issues before the Board of Supervisors." Sweeney Dep. & Ex. D. According to the article, Sweeney described the Hawkins Peak project as "an amorphous, mysterious project." Sweeney Dep. at 85 & Ex. D.

- At lunch one day, Knorr told Crawford she thought Levy may be guilty of a crime. Crawford Dep. 59–60.

After the LCW report was released, the Sheriff felt compelled to relieve Levy of his responsibilities related to the telecommunications projects. Crawford Decl. ¶ 10. Crawford believed Knorr and Sweeney "wanted Levy terminated at any cost." *Id.* During this time, Levy experienced health problems, including stress, weight gain, plantar fasciitis, back pain, headaches, irritability, nightmares, insomnia, chronic fatigue, and colorectal problems. Levy Dep. 237–38. These concerns did not prevent him from doing his job, but they made his work more difficult. *Id.* at 238–39. Levy declined to run for Sheriff in 2013 because he believed he was unelectable in the wake of the LCW report. Levy Dep. 132. Veatch agrees Levy had no chance to be elected at that point, Veatch Decl. ¶ 11, and Crawford estimates "the report and its public unveiling created such controversy around Undersheriff Levy that his ability to seek the office of the Sheriff went from reasonably possible to no possibility at all." Crawford Decl. ¶ 9.

Knorr's employment ended in August 2013, Knorr Decl. at 1, and Sweeney's term as Supervisor concluded in January 2013, Sweeney Dep. 12. At the County's "specific request," Crawford then restored Levy to some but not all of his former responsibilities with respect to the telecommunications projects. Crawford Decl. ¶ 10.

Levy filed a complaint in this court on December 20, 2013. ECF No. 1. As the parties stipulated, several claims and defendants were dismissed voluntarily. *See* Minute Orders, ECF Nos. 8, 24. Six claims remain: (1) First Amendment retaliation and Equal Protection claims against the County under 42 U.S.C. § 1983; (2) conspiracy to violate Levy's civil rights under 42 U.S.C. § 1985 against the County, Knorr, and Sweeney; (3) age discrimination against the County under California Government Code section 12940(a); (4) unlawful retaliation against the

1  County under Government Code section 12940(h); (5) failure to prevent retaliation against the

2  County under Government Code section 12940(k); and (6) defamation under California Civil

3  Code sections 44–46.

4         Levy retired in mid-2015, during the pendency of this case, at the top of his pay

5  grade, and he characterizes his retirement as "premature."[3]  *See* UMF no. 28; Levy Dep. 155–58,

6  192; Levy Decl. ¶ 2.  He never received a poor evaluation.  UMF no. 29.

7         The defendants moved for summary judgment on October 26, 2015.  Mot., ECF

8  No. 26; Mem. P. & A., ECF No. 26-2.  Levy opposed the motion, ECF No. 31, and the

9  defendants replied.  ECF No. 35.  The defendants also submitted a supplemental reply, at the

10  court's invitation, to address matters Levy's counsel raised at hearing.  ECF No. 38.

11  III.    LEVY'S SUPPLEMENTAL BRIEFING AND EX PARTE APPLICATION

12         Following hearing, Levy filed an ex parte application for permission to file a

13  supplemental declaration in support of his opposition brief.  ECF No. 39.  The Local Rules of this

14  district require that oppositions to any noticed motion must be filed and served no less than

15  fourteen days before the hearing.  E.D. Cal. L.R. 230(c).  This court's standing order also

16  provides that "[n]o supplemental brief shall be filed without prior leave of court."  Standing

17  Order 3, ECF No. 4-1.

18         While Levy seeks the court's leave to supplement his prior filings, he has not

19  provided an explanation for his delay.  The hearing had in fact already been continued to allow

20  Levy's counsel to obtain additional information.  *See* ECF No. 29; *see also, e.g.*, *Mission Power*

21  *Eng'g Co. v. Cont'l Cas. Co.*, 883 F. Supp. 488, 492 (C.D. Cal. 1995) (ex parte applications are

22  ordinarily denied unless "the moving party is without fault in creating the crisis that requires ex

23  parte relief" or "the crisis occurred as a result of excusable neglect").  The ex parte application is

24  denied, and Levy's supplemental reply is stricken.

25

26         [3] Given his retirement date ("mid-2015") and birth date (September 9, 1964), Levy was
27  fifty or fifty-one years old at retirement.  Viewing this evidence in the light most favorable to his
    case, the court assumes for purposes of this motion that his retirement was in advance of his
28  required law-enforcement retirement date.

8

IV.     <u>LEGAL STANDARD</u>

A court must grant a motion for summary judgment "if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A motion for summary judgment calls for a "threshold inquiry" into whether a trial is necessary at all, that is, whether "any genuine factual issues . . . properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). The court does not weigh evidence or assess the credibility of witnesses; rather, it determines which facts the parties do not dispute, then draws all inferences and views all evidence in the light most favorable to the nonmoving party. *See id.* at 255; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

The moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the party opposing summary judgment bears the burden of proof at trial, the moving party need only illustrate the "absence of evidence to support the non-moving party's case." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010). The burden then shifts to the nonmoving party to "go beyond the pleadings" and "designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (quotation marks omitted). The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248.

/////

/////

/////

1    V.      DISCUSSION

2            A.      First Amendment Retaliation and Equal Protection

3                    Levy asserts this claim under 42 U.S.C. § 1983 against only the County.

4    Municipal bodies are subject to liability under § 1983. *Monell v. Dep't of Soc. Servs. of City of*

5    *N.Y.*, 436 U.S. 658, 690 & n.54 (1978).  The "touchstone" of such a claim is the plaintiff's

6    allegation that the defendant's official policy is responsible for his injury.  *Id.* at 690–91.

7    "Policy" can be a vexing word, blending into the terms "custom" and "usage," which are

8    expressly used in the statute.  *See* 42 U.S.C. § 1983 (imposing liability on every "person" who

9    deprives another of federally protected rights "under color of any statute, ordinance, regulation,

10   custom, or usage").  The word "policy" does mean a singular decision "officially adopted and

11   promulgated" by a local government's officers, *Monell*, 436 U.S. at 690, "the acts of its

12   policymaking officials," *Connick v. Thompson*, 563 U.S. 51, 61 (2011).  In other words,

13   "municipal liability may be imposed for a single decision by municipal policymakers" when their

14   "acts or edicts may fairly be said to represent official policy." *Pembaur v. City of Cincinnati*, 475

15   U.S. 469, 480 (1986) (quoting *Monell*, 436 U.S. at 694).  Thus "a local government may be held

16   liable under § 1983 when the individual who committed the constitutional tort was an official

17   with final policy-making authority" in the relevant sphere.  *Clouthier v. Cnty. of Contra Costa*,

18   591 F.3d 1232, 1249 (9th Cir. 2010) (citation and quotation marks omitted).

19                   Here, Levy alleges County officials unconstitutionally retaliated against him.

20   Compl. ¶ 38.  The County correctly notes the absence of any evidence of a written policy or

21   longstanding custom or practice of retaliation, or a pattern of similar violations.  But Levy has

22   presented evidence that could lead a reasonable trier of fact to believe (1) the County's

23   administrative officer, acting within her policy-making responsibility, instituted an investigation

24   of the telecommunications projects in an effort to discredit Levy and terminate his employment

25   and (2) the Board of Supervisors approved the investigation.  In the context of the small size of

26   Alpine County and its government, Levy has in this way set up a triable case against the County.

27   It may well be that Levy proves neither of his constitutional claims, but because the County's

28

1   motion advances no other argument than the absence of a policy, the court does not reach any

2   further question on this claim.

3         B.        Conspiracy to Violate Civil Rights under 42 U.S.C. § 1985(3)

4               "Section 1985(3) provides no substantive rights itself; it merely provides a remedy

5   for violation of the rights it designates." *Great Am. Fed. Sav. & Loan Ass'n v. Novotny*, 442 U.S.

6   366, 372 (1979).  It is not to be construed as a "general federal tort law." *Gerritsen v. de la*

7   *Madrid Hurtado*, 819 F.2d 1511, 1518–19 (9th Cir. 1987).  A claim under § 1985(3) has four

8   elements: "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any

9   person or class of persons of the equal protection of the laws, or of equal privileges and

10  immunities under the laws; and (3) an act in furtherance of this conspiracy; (4) whereby a person

11  is either injured in his person or property or deprived of any right or privilege of a citizen of the

12  United States." *Sever v. Alaska Pulp Corp.*, 978 F.2d 1529, 1536 (9th Cir. 1992) (quoting *United*

13  *Brotherhood of Carpenters and Joiners of Am. v. Scott*, 463 U.S. 825, 828–29 (1983)).

14              Section 1985(3) protects the right to be free from racial discrimination, *Life Ins.*

15  *Co. of N. Am. v. Reichardt*, 591 F.2d 499, 503 (9th Cir. 1979), but "courts have struggled to

16  determine whether and when § 1985(3) applies in contexts not involving race, and have produced

17  opinions that are all over the map," *Sever*, 978 F.2d at 1536 (collecting authority).  In this circuit,

18  § 1985(3) extends beyond race discrimination "only when the class in question can show that

19  there has been a governmental determination that its members 'require and warrant special federal

20  assistance in protecting their civil rights.'" *Id.* (quoting *Schultz v. Sundberg*, 759 F.2d 714, 718

21  (9th Cir. 1985)).

22              Levy argues the defendants discriminated against him on the basis of his age when

23  they made decisions related to his employment as Undersheriff.  *See also* Compl. ¶ 44; Opp'n at

24  10–11.  But for some time now, federal courts, including this court, have held that age

25  discrimination employment claims may not be channeled through § 1985(3).  *See, e.g.*, *Webb v.*

26  *Cty. of El Dorado*, No. 15-1189, 2015 WL 9480956, at *6 (E.D. Cal. Dec. 29, 2015); *Steshenko v.*

27  *Gayrard*, 70 F. Supp. 3d 979, 999 (N.D. Cal. 2014); *Hetzler v. Gianunzio*, No. 96-3710, 1997 WL

28  33805, at *6 (N.D. Cal. Jan. 23, 1997); *Golden v. Shapell Indus., Inc.*, No. 80-510, 1980 WL 213,

1   at *2 (N.D. Cal. July 31, 1980); *see also United States v. Flores-Villar*, 536 F.3d 990, 998 (9th

2   Cir. 2008), *aff'd*, 564 U.S. 210 (2011) (age is not a suspect classification).

3          Summary judgment is granted as to this claim.

4          C.      FEHA Age Discrimination

5          The FEHA prohibits employment discrimination on the basis of age.  *See* Cal.

6   Gov't Code § 12940(a).  More specifically, an employer may not take an "adverse action toward

7   an employee 'because of' his or her membership in a protected classification." *McCaskey v.*

8   *California State Auto. Ass'n*, 189 Cal. App. 4th 947, 979 (2010).  "For purposes of an age

9   discrimination claim, the protected class is persons over 40 years of age."  *Id.* at 978 (citing Cal.

10  Gov't Code § 12926(b)).  A claim for violation of section 12940(a) is a "disparate treatment"

11  claim.  *Id.*

12          "California has adopted the three-stage burden-shifting test established by the

13  United States Supreme Court for trying claims of discrimination, including age discrimination,

14  based on a theory of disparate treatment."  *Guz v. Bechtel Nat. Inc.*, 24 Cal. 4th 317, 354 (2000)

15  (citing, *inter alia*, *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).  First, the plaintiff

16  must establish a *prima facie* case of discrimination.  "Generally, the plaintiff must provide

17  evidence that (1) he was a member of a protected class, (2) he was qualified for the position he

18  sought or was performing competently in the position he held, (3) he suffered an adverse

19  employment action, such as termination, demotion, or denial of an available job, and (4) some

20  other circumstance suggests discriminatory motive."  *Id.* at 355.  If the employee meets this

21  burden, the employer is presumed to have discriminated unlawfully.  *See id.*

22          Levy has not established a *prima facie* case of age discrimination because he has

23  presented no evidence he suffered an adverse employment action.  The term "adverse

24  employment action" is not defined in the FEHA.  *Yanowitz v. L'Oreal USA, Inc.*, 36 Cal. 4th

25  1028, 1049 (2005).  In the absence of a statutory definition, the California Supreme Court has

26  held that "the proper standard for defining an adverse employment action is the 'materiality' test,

27  a standard that requires an employer's adverse action to materially affect the terms and conditions

28

of employment." *Id.* at 1036.  The court must, however, take the totality of the circumstances into account, including the context of the plaintiff's workplace. *Id.* at 1052.

Under this standard, an "offensive utterance or even a pattern of social slights" do not suffice to meet the materiality test. *Id.* at 1054.  Likewise "trivial adverse actions" that are reasonably likely to "do no more than anger or upset an employee" fall outside the bounds of section 12940(a). *Id.* at 1054–55.  And changes that are "merely contrary to the employee's interests or not to the employee's liking" do not alone support a claim. *McRae v. Dep't of Corr. & Rehab.*, 142 Cal. App. 4th 377, 386 (2006) (citation and quotation marks omitted).  Rather, the employer's actions must have a "detrimental and substantial effect on the plaintiff's employment." *Id.*

It is undisputed Levy maintained his position and received no negative performance evaluation.  He suffered no pay cut and retired at the top of his pay grade.  Although he calls his retirement "premature," Levy has presented no evidence showing he was constructively discharged. *Cf. Turner v. Anheuser-Busch, Inc.*, 7 Cal. 4th 1238, 1246 (1994) ("In order to establish a constructive discharge, an employee must plead and prove . . . that the employer either intentionally created or knowingly permitted working conditions that were so intolerable or aggravated at the time of the employee's resignation that a reasonable employer would realize that a reasonable person in the employee's position would be compelled to resign.").  Moreover, it is undisputed he retired only after Knorr and Sweeney left the County government.

The most significant event in the course of Levy's employment was the County's decision to commission and release the LCW report.  But Levy has presented no evidence the terms or conditions of his employment changed during the report's preparation, and upon its release, the only change he experienced was temporary relief from duties related to the telecommunications projects.  Moreover, Levy testified in deposition that the County had discriminated against him by imposing these additional duties on him without additional pay.  Levy Dep. 155–56.  In addition, although Levy and Veatch believe the LCW report inaccurately recounts Levy's role in the projects, he has produced no evidence to show the County, rather than

1    LCW, was responsible for the report's contents.  Neither has Levy presented evidence showing

2    the report altered the terms or conditions of his employment as Undersheriff.  Moving his office

3    five miles down the road to Turtle Rock may have been inconvenient and contrary to his interests,

4    but he has not shown the move had a "detrimental and substantial effect" on his ability to do his

5    job.  *McRae*, 142 Cal. App. 4th at 386.

6         Because Levy has not established a *prima facie* case of discrimination, summary

7    judgment is granted on this claim.

8         D.    Retaliation

9         An employer may not discharge or "otherwise discriminate" against its employees

10   for reporting unlawful employment discrimination.  *See* Cal. Gov't Code § 12940(h).  "[T]he term

11   'otherwise discriminate' in section 12940(h) should be interpreted to refer to and encompass the

12   same forms of adverse employment activity that [are] actionable under section 12940(a)."

13   *Yanowitz*, 36 Cal. 4th at 1050–51.  The same burden-shifting scheme also applies to claims under

14   both subdivisions 12940(a) and (h).  *Id.* at 1042.  Because Levy has not met the County's motion

15   with evidence showing he suffered an adverse employment action, summary judgment is also

16   granted on this claim.

17        E.    Failure to Prevent Discrimination and Retaliation

18        Levy's claims of the County's failure to prevent discrimination are founded on the

19   same allegations and evidence as his claims for discrimination and retaliation.  *See* Compl.

20   ¶¶ 62-66; Opp'n at 11–12.  No claim for failure to prevent discrimination or retaliation can

21   continue where no discrimination or retaliation are shown to have occurred.  *See, e.g.*, *Dickson v.*

22   *Burke Williams, Inc.*, 234 Cal. App. 4th 1307, 1318 (2015).  Summary judgment is therefore also

23   granted on this claim.

24        F.    Defamation

25        Defamation is libel or slander.  *See* Cal. Civ. Code § 44.  Libel is a false,

26   unprivileged, memorialized publication that exposes a person to "hatred, contempt, ridicule, or

27   obloquy," that causes the person "to be shunned or avoided," or that "has a tendency to injure him

28   in his occupation."  *Id.* § 45.  Slander is a false, unprivileged, oral publication that, among other

1   things, charges a person with a crime, injures him in his "office, profession, trade or business," or

2   "by natural consequence causes actual damage." *Id.* § 46. A "privileged publication" is one

3   made in the "proper discharge of an official duty" or in a "(1) legislative proceeding, (2) judicial

4   proceeding, (3) in any other official proceeding authorized by law, or (4) in the initiation or

5   course of any other proceeding authorized by law and reviewable pursuant [California Civil Code

6   sections 1084 *et seq.*]." Cal. Civ. Code § 47(a).

7           If the plaintiff in a defamation case is a public figure, as a matter of federal

8   constitutional law, he must show each defamatory statement was made "with knowledge that it

9   was false or with reckless disregard of whether it was false or not." *N.Y. Times Co. v. Sullivan*

10  376 U.S. 254, 279–80 (1964); *Ampex Corp. v. Cargle*, 128 Cal. App. 4th 1569, 1577 (2005). The

11  plaintiff bears the burden to make this showing by clear and convincing evidence. *Bose Corp. v.*

12  *Consumers Union of U.S., Inc.*, 466 U.S. 485, 510 n.30 (1984). Nothing suggests these rules

13  apply differently in a small town. *See, e.g.*, *Shafer v. Lamar Pub. Co.*, 621 S.W.2d 709 (Mo. Ct.

14  App. 1981) (small-town police officer was a public figure).

15          Levy does not dispute he is a public figure, and courts have concluded law

16  enforcement officers are public figures for purposes of their defamation claims. *See, e.g.*, *Rattray*

17  *v. City of Nat'l City*, 51 F.3d 793, 800 (9th Cir. 1994); *McCoy v. Hearst Corp.*, 42 Cal. 3d 835,

18  841 & n.3 (1986); *see also Rosenblatt v. Baer*, 383 U.S. 75, 85 (1966) ("[T]he 'public official'

19  designation applies at the very least to those among the hierarchy of government employees who

20  have, or appear to the public to have, substantial responsibility for or control over the conduct of

21  governmental affairs."). The court agrees Levy is a public figure for purposes of his defamation

22  claim.

23          Levy has not met his burden on this claim in response to the defendants' motion.

24  First, Levy has presented no evidence to show that Sweeney's statements about the "amorphous"

25  and "mysterious" nature of the Hawkins Peak project were false. The same is true of Sweeney's

26  statement of his own distrust. Second, in response to the defendants' argument that each

27  allegedly defamatory statement is privileged under Civil Code section 47, Levy points to only two

28  statements he claims were unprivileged: those of Knorr and Sweeney when they told Nunes that

1   Levy had lied to the Board of Supervisors.  *See* Opp'n at 13–14.  But Levy has presented no

2   evidence, let alone clear and convincing evidence, showing Knorr and Sweeney knew he had told

3   the truth or showing they recklessly disregarded the falsity of their words.  "Actual malice

4   consistently has been deemed subjective in nature, provable only by evidence that the defendant

5   'realized that his statement was false or that he subjectively entertained serious doubt as to the

6   truth of his statement.'"  *Newton v. Nat'l Broadcasting Co.*, 930 F.2d 662, 668 (9th Cir. 1990)

7   (quoting *Bose*, 466 U.S. at 510 n.30).  Although the record may imply Knorr and Sweeney

8   disliked or even hated Levy, evidence of "spite, hostility, or deliberate intention to harm" is not a

9   substitute for a showing of "actual malice" as defined by the Supreme Court.  *Shoen v. Shoen*,

10   48 F.3d 412, 417 (9th Cir. 1995) (quoting *Greenbelt Coop. Pub. Ass'n v. Bresler*, 398 U.S. 6, 10–

11   11 (1970)).

12          Summary judgment is granted on this claim.

13   VI.   <u>CONCLUSION</u>

14          Summary judgment is GRANTED on all claims but the first, brought under

15   42 U.S.C. § 1983.  The supplemental declaration at ECF No. 39 is STRICKEN.  This order

16   resolves ECF No. 26.

17          IT IS SO ORDERED.

18    DATED:  March 10, 2016.

19

20   _____

21   UNITED STATES DISTRICT JUDGE

22

23

24

25

26

27

28

16